IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ANDY COSFERENT, derivatively on behalf of MANDY ENTERTAINMENT, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>FACULTY PRODUCTIONS, LLC,<br><br>    Defendant. | Case No. 3:23-cv-797 |

**VERIFIED COMPLAINT**

### I.  Summary of the Case

1. This is a derivative action pursued by Mr. Cosferent on behalf of Mandy Entertainment, LLC ("Mandy Entertainment") arising out of Faculty Productions, LLC's intentional and material breaches of the parties' contract and Faculty's theft of Mandy Entertainment property. Despite admitting that it owes Mandy Entertainment nearly $300,000.00 and that it has in its possession and control various Mandy Entertainment property, Faculty has refused to pay the amount due or return the property, forcing Plaintiff to file this action.

### II.  The Parties

2. Mandy Entertainment is a Delaware limited liability company with its principal place of business in this District. The members of Mandy Entertainment are Andy Cosferent and Monica Aldama, both citizens and residents of this District. Mr. Cosferent and Mrs. Aldama both own fifty percent (50%) of Mandy Entertainment. There are no officers of the company and all decisions require at least majority consent under the company's operating agreement. Mr. Cosferent is currently a member of Mandy Entertainment and was at the time of the transaction

complained of, and this action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

3. Monica Aldama is the current cheerleading coach at Navarro College in Corsicana, Texas. Mr. Cosferent was previously an assistant coach at the college. In 2020, Mrs. Aldama and Mr. Cosferent were featured in a Netflix docuseries titled "Cheer," which featured the Navarro College cheer program.

4. Defendant Faculty Productions, LLC ("Faculty") is a Delaware limited liability company with its principal place of business in California. Upon information and belief, Faculty is owned by Front Line Management Group, Inc.[1] At all times from 2013 to the present, Front Line Management Group, Inc. has been wholly owned by Live Nation Entertainment, Inc., which, according to Secretary of State records, shares an office with Faculty.

### III.     Jurisdiction and Venue

5. This Court has subject-matter jurisdiction of this case under 28 U.S.C. §§ 1331 and 1338(a).

6. Further, diversity of citizenship exists pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00 and this action is between citizens of different states.

7. Venue lies in this Court pursuant to 28 U.S.C. § 1391(b).

8. This Court has personal jurisdiction over Defendant because it has purposely availed itself of conducting business in Texas.

---

[1] Faculty was formed in 2013 by its then-manager, Kathy Willard, the EVP and CFO of Front Line Management Group, Inc. Ms. Willard  the was CFO of Live Nation Entertainment, Inc. until 2021.

### III.     The Facts

<u>The Global Touring Rights Agreement</u>

9. On the heels of the success of the Netflix documentary, on March 13, 2020, Faculty Productions, LLC and Mandy Entertainment, LLC f/s/o Monica Aldama and Andy Cosferent entered into a contract with respect to a "Cheer Live" tour. A true and correct copy of this "Cheer Live On Tour Global Touring Rights Agreement" is attached hereto as **Exhibit 1**.

10. The agreement provides that the tour will be "based upon the experiences of Monica Aldama and Andy Cosferent as coaches for championship cheerleaders and their involvement with national collegiate cheerleading competitions."

11. Faculty was granted exclusive production rights in and to the first leg of the tour.

12. The term of the agreement was for one year from February 24, 2020, which was extended to December 31, 2022 by amendment. Faculty was also granted a right of first negotiation for a second tour with Mandy Entertainment, but it chose not to exercise that right.

13. Pursuant to paragraph 6(b) of the agreement, Faculty agreed to pay Mandy Entertainment a fee (deductible from the tour's income) in the amount of Three Hundred Twenty Thousand Dollars ($320,000.00). Via amendment dated March 7, 2022, the fee was reduced to One Hundred Thousand Dollars ($100,000.00) because Faculty claimed the tour was not doing well. A true and correct copy of this amendment is attached hereto as **Exhibit 2**.

14. Additionally, in paragraph 6(c) of the agreement, Faculty agreed to pay "Net Receipts" to Mandy Entertainment, as follows:

> After recoupment "off-the-top" of all actual out-of-pocket non-overhead costs paid in connection with the Tour, including, without limitation, the Creative Fee [the $100,000.00 paid to Mandy Entertainment], all show and production costs, promotion and advertising costs, collection, legal and accounting costs, and all other reasonable and customary costs and expenses in connection with the Tour, as paid by Faculty or ME (collectively, "Tour Expenses"), ME shall be entitled to

receive Forty Percent (40%) of the Net Profits ("Net Profit Share") . . . . The parties agree that "Net Profits" shall be defined as gross monies and other considerations actually received from all sources related to the Tour, including, without limitation, any Tour-related content revenue, credits, rebates, and insurance and litigation proceeds ("Gross Proceeds") less Tour Expenses.

15. Paragraph 6(d) provides that Net Receipts shall be accounted and paid as follows:

No later than sixty (60) days after the end of each so-called "run or leg" of the Tour, Faculty shall provide ME with a preliminary statement reflecting estimated cumulative calculations of Gross Proceeds, Tour Expenses and the calculation of Net Profits ("Preliminary Statement"), and ME shall be paid Seventy-Five Percent (75%) of Net Profits shown to be due to ME as of that date. Thereafter, within thirty (30) days of receiving all revenue derived from the Tour, Faculty shall provide ME with a final accounting reflecting adjustments to the Preliminary Statement based upon final tallies of Gross Proceeds and Tour Expenses in the calculation of Net Profits ("Final Statement"), together with applicable payment of the balance of ME's share of Net Profits.

16. Faculty also agreed that Mandy Entertainment had the right to approve, among other things, "all business matters relating to the Tour, including without limitation the material terms of any third party agreements, the line-item Tour budget, inclusive of show expenses and the budget for the advertising and promotion of the Tour," and the right to approve "all Tour Expenses . . . ."

17. "Cheer Live" social media accounts were created to promote the tour. By the end of the tour, the accounts had well over 100,000 followers.

18. Pursuant to paragraph 5 of the agreement, Mandy Entertainment owns all intellectual property related to the tour, including the social media accounts and the name "Cheer Live":

all intellectual property rights in and the Tour, including, without limitation, the name Cheer Live On Tour (or alternate name selected for use in connection with the Tour) (the "Mark"), and all products and materials created in connection with the Tour, including but not limited to, merchandise, artwork, trademarks, copyrights, concepts and any and all other creative elements in connection with the Tour.

This paragraph goes on to say that all materials are works for hire or, alternatively:

> Faculty hereby irrevocably assigns, grants and transfers to ME, and shall cause such third parties to similarly assign, grant and transfer to ME, in perpetuity throughout the universe, all of the foregoing rights [results and proceeds of Faculty's services (including the services of all third parties furnished by Faculty)], in and to such results and proceeds without reservation, condition or limitation, and no right of any kind, nature or description is reserved by Faculty Promptly after ME's request, Faculty shall execute, documentation of Faculty's assignments, as well as any applicable post-Term contractual rights pertaining to the Tour.

<u>Faculty's Preliminary Statement, Purported Settlement Discussions, and Unilateral Termination of Settlement Discussions</u>

19. On or about October 7, 2022, Faculty provided Mandy Entertainment with the Preliminary Statement required by paragraph 6(d) of the agreement. The statement showed Mandy Entertainment was owed $317,733.00 in Net Profits, and that Faculty's share of the tour income was $476,599.00.

20. However, Faculty did not pay 75% of Net Profits shown to be due to ME as of that date, as required by the contract.

21. Instead, Faculty asked Mandy Entertainment to accept only $200,000.00.

22. The parties then engaged in settlement discussions for several months, exchanging competing redlines of a settlement agreement.

23. Amy Chai, the Vice President of Business & Legal Affairs for Live Nation, handled negotiations on behalf of Faculty.

24. As early as December of 2022, Mandy Entertainment, through counsel, made clear to Faculty that, consistent with paragraph 5 of the agreement, Mandy Entertainment owned the social media accounts and the name "Cheer Live."

25. After months of negotiations, inexplicably, via email dated February 17, 2023, Ms. Chai stated that Faculty was unilaterally withdrawing from settlement discussions and would

instead "abide by the terms of the original agreement, as amended." Ms. Chai concurrently represented via email that, "Statements are being prepared in accordance with the terms of the agreement." (*See* **Exhibit 6** at pp. 9, 11.)

26. Counsel subsequently contacted Ms. Chai via phone and email asking for clarity on these statements, but received no response.

Faculty's Blatant Conversion of Mandy Entertainment Property and Material Breaches

27. Around this same time, it was discovered that Faculty and Mrs. Aldama were planning a second "Cheer Live" tour without Mr. Cosferent.

28. Therefore, due to the inevitable conflict between Mr. Cosferent and Mrs. Aldama, counsel for Mandy Entertainment withdrew from his representation of Mandy Entertainment. Mr. Cosferent and Mrs. Aldama each retained their own counsel to handle negotiations with Faculty going forward.

29. Then, on February 25, 2023, Faculty and Mrs. Aldama announced a second "Cheer Live" tour under the name "House of Cheer."

30. Incredibly, instead of creating their own social media accounts, Faculty, with Mrs. Aldama's assistance and support, took *Mandy Entertainment's* social media accounts and changed the usernames and handles to "House of Cheer."

31. Similarly, Faculty took the URL for the first tour (www.cheertourofficial.com) and used it to re-direct to their *own* website (www.houseofcheer.com). Much of this website simply copied and pasted from the original Cheer Live website. "Cheer Live" appeared in various places on the House of Cheer website until recently. Although Faculty subsequently stopped using www.cheertourofficial.com to redirect to the House of Cheer website, it has refused to transfer the domain back to Mandy Entertainment.

32. Furthermore, Faculty has refused to return tens of thousands of dollars' worth of physical property belonging to Mandy Entertainment, including large inflatable floors and roll-up panel mats. Faculty has also refused to disclose the location of these materials.

33. Given Faculty's withdrawal from settlement discussions and conversion of Mandy Entertainment property (and Mrs. Aldama's involvement with the same), Mr. Cosferent had no choice but to take action.

34. Via letter dated February 24, 2023, through counsel, Mr. Cosferent provided Faculty with written notice of its numerous breaches, stating that he intended to pursue a derivative action on behalf of Mandy Entertainment, LLC if Faculty did not cure its breaches and cease its unauthorized exploitation of Mandy Entertainment property. This letter also demanded an audit under paragraph 6(e) of the contract. A true and correct copy of this letter is attached hereto as **Exhibit 3**.

35. That same day, Mr. Cosferent, though counsel, also demanded that Mrs. Aldama, as fifty percent (50%) member of the company, approve of Mandy Entertainment, LLC taking action against Faculty to hold Faculty liable for to its numerous breaches and conversion of Mandy Entertainment property. A true and correct copy of this letter is attached hereto as **Exhibit 4**.

36. Mrs. Aldama, of course, refused to take action. The reason is clear. She is personally benefiting from Faculty's breaches and conversion of Mandy Entertainment property.

37. One week later, on March 3, 2023, Faculty responded through its newly retained outside counsel, claiming (inaccurately) that Faculty had not paid Net Profits because "it has been unsuccessful in communicating with anybody representing ME" and claiming it required assistance or information from Mandy Entertainment to prepare the Final Statement. A true and

correct copy of this letter is attached hereto as **Exhibit 5**.

38.     On March 5, 2023, Mr. Cosferent responded, via counsel, again demanding that Faculty cure its various breaches of the agreement and cease the unauthorized use of Mandy Entertainment property. A true and correct copy of this letter is attached hereto as **Exhibit 6**.

39.     On March 17, 2023, notably without any assistance or information from Mandy Entertainment, Faculty provided the Final Statement that it previously represented was still being prepared in late February. The Final Statement was dated December 31, 2022, indicating it had actually been completed months ago and that Faculty had been engaging in dilatory conduct to avoid its payment obligations.

40.     According to the Final Statement, expenses had (coincidentally) increased significantly since the October 2022 Preliminary Statement, reducing Mandy Entertainment's share of Net Profits to $289,643.00. "Administrative Touring Costs" increased from $100,275.00 on the Preliminary Statement to $165,275.00 on the Final Statement, based on a $15,000.00 increase in "business management" and a $50,000.00 increase on "legal".

41.     However, Faculty did not seek or receive Mandy Entertainment's approval for these expenses, despite the contract's clear requirement that it do so. And, again, paragraph 6 of the agreement only permits "actual out-of-pocket non-overhead costs paid in connection with the Tour" to be deducted from the gross tour income.

42.     Therefore, Mr. Cosferent, through counsel, requested the backup invoices showing the $15,000.00 increase in "business management" and $50,000.00 increase on "legal". Faculty has not responded to that request.

43.     Significantly, Faculty has made clear that it does not dispute that it owes Mandy Entertainment at least $289,643.00 in Net Profits. Nonetheless, despite repeated requests that it

pay this undisputed amount to Mandy Entertainment, Faculty has refused to do so.

44. Of course, Mandy Entertainment may be owed additional Net Profits if the unapproved expenses on the Final Statement are, as suspected, not out-of-pocket, non-overhead costs actually paid by Faculty in connection with the tour.

### V. Causes of Action

#### Count 1 – Breach of Contract

45. Plaintiff sues Defendant for breach of contract.

46. As discussed above, Faculty has breached the contract in numerous ways, including by:

   a. failing to pay Net Profits;

   b. failing to properly account to Mandy Entertainment and/or providing inaccurate or intentionally false accounting statements;

   c. failing to timely account to Mandy Entertainment;

   d. failing to comply with audit demands under paragraph 6(e) of the contract; and

   e. failing to obtain Mandy Entertainment's approval for tour expenses.

47. As a result of these breaches, Mandy Entertainment has suffered damages.

#### Count 2 – Conversion and/or Theft of Physical Property Under Tex. Civ. Prac. & Rem. Code § 134.001 et seq.

48. Plaintiff sues Defendant for theft and conversion.

49. As discussed above, Faculty entertainment has exercised control over the physical property of Mandy Entertainment without consent and has refused to return the same despite Mandy Entertainment's prior demands.

50. Faculty's conduct was deliberate, intentional, knowing, and willful.

51. As a result of these actions, Mandy Entertainment has suffered damages.

Count 3 – Theft of Intangible Property
Under Tex. Civ. Prac. & Rem. Code § 134.001 *et seq*.

52. Plaintiff sues Defendant for theft of Mandy Entertainment's website URL and social media accounts.

53. As discussed above, Faculty entertainment has exercised control over the website URL and social media accounts of Mandy Entertainment without consent and has refused to return the same despite Mandy Entertainment's repeated demands.

54. Faculty's conduct was deliberate, intentional, knowing, and willful.

55. As a result of these actions, Mandy Entertainment has suffered damages.

Count 4 – Theft of Services
Under Tex. Civ. Prac. & Rem. Code § 134.001 *et seq*.

56. Defendant intentionally and knowingly secured the performance of services from Plaintiff by agreeing to provide compensation in connection with the tour, as set forth in the parties' contract.

57. After the services were rendered, despite repeated demands for payment, Defendant failed to make full payment.

Count 5 – Unjust Enrichment

58. Plaintiff sues Defendant for unjust enrichment.

59. At all relevant times, Faculty was aware that the social media accounts were Mandy Entertainment property under paragraph 5 of the contract.

60. And yet, Faculty intentionally and blatantly converted the social media accounts and put them to its own use.

61. By taking Mandy Entertainment's social media accounts, re-branding them as "House of Cheer," and using them to promote "House of Cheer," Faculty has been unjustly

enriched to the detriment of Mandy Entertainment.

62. Faculty has received the benefit of—and continues to generate revenue from—the use of Mandy Entertainment social media accounts, without compensating Mandy Entertainment or receiving permission from Mandy Entertainment to use the accounts.

63. It is fundamentally unfair to permit Faculty to take Mandy Entertainment's social media accounts and followers without compensation.

### Count 6 – Violation of the Lanham Act

64. Plaintiff sues Defendant for causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of Defendant's services and for causing likelihood of confusion or misunderstanding as to the affiliation, connection or association with, or certification by, Plaintiff with Defendant, in violation of the Lanham Act, 15 U.S.C. § 1125(a).

65. Faculty's prior use of the URL (www.cheertourofficial.com) and its conversion and continued use of Mandy Entertainment's social media accounts (including the goodwill embodied in the followers) is likely to cause confusion in the marketplace as to whether Faculty and/or "House of Cheer" are endorsed by or associated with Mandy Entertainment and/or Mr. Cosferent.

66. Faculty's conduct was deliberate, intentional, knowing, and willful.

### VI.    Demand

WHEREFORE, Plaintiff demands:

A. Compensatory damages in an amount exceeding $500,000.00, the specific amount to be proven at trial;

B. All consequential and incidental damages;

  C. All available remedies under the Lanham Act, including, without limitation:

    i. A preliminary injunction preventing Faculty's further use of the social media accounts and URL pending the outcome of this action;

    ii. That the aforementioned preliminary injunction be made permanent;

    iii. An injunction requiring Faculty to transfer control of the social media accounts and URL to Mandy Entertainment;

    iv. Actual damages;

    v. An accounting and disgorgement of Defendant's profits associated with its use of the URL and social media accounts; and

    vi. Impoundment and destruction of all infringing articles.

  D. An injunction and/or replevin requiring Faculty to return Mandy Entertainment's property;

  E. Punitive damages for Defendant's intentional conduct, as set forth above;

  F. Pre-judgment interest;

  G. Post-judgment interest;

  H. Attorneys' fees pursuant to the parties' contract, the Lanham Act, Tex. Civ. Prac. & Rem. Code § 134.005, and/or Tex. Civ. Prac. & Rem. Code § 38.001;

  I. That all costs be taxed to the Defendant; and

  J. Such other and further relief to which it may be entitled.

## VERIFICATION

I declare under penalty of perjury that the facts set forth in this Complaint are true and correct.

_____
Andy Cosferent

Date: 04/12/23

Scanned with CamScanner

Respectfully submitted,

KAY GRIFFIN, PLLC

s/ Michael A. Johnson
Brian Berger (Tex. Bar No. 24089985)
(*pro hac vice pending*)
2110 W. Slaughter Lane
Ste 107-679
Austin, TX 78748
737-301-8400
brian.berger@kaygriffin.com

Michael A. Johnson (TN Bar No. 30210)
(*pro hac vice pending*)
222 Second Avenue North, Suite 340-M
Nashville, Tennessee 37201
615-742-4800
mjohnson@kaygriffin.com

*Attorneys for Plaintiff*